**KAZEROUNI LAW GROUP, APC**
Abbas Kazerounian, Esq. (SBN: 249203)
ak@kazlg.com
Pamela E. Prescott, Esq. (SBN: 328243)
pamela@kazlg.com
245 Fischer Avenue, Unit D1
Costa Mesa, CA 92626
Telephone: (800) 400-6808
Facsimile: (800) 520-5523

**KAZEROUNI LAW GROUP, APC**
Jason A. Ibey, Esq. (SBN: 284607)
jason@kazlg.com
321 N Mall Drive, Suite R108
St. George, Utah 84790
Telephone: 800-400-6808
Facsimile: 800-520-5523

*Attorneys for Plaintiffs*

### UNITED STATES DISTRICT COURT
### CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **ALEXANDRA HOEVELKAMP, KELLY HOEVELKAMP, and TIMOTHY HOEVELKAMP, Individually and On Behalf of All Others Similarly Situated,**<br><br>**Plaintiffs,**<br><br>v.<br><br>**JPMORGAN CHASE BANK, N.A.,**<br><br>**Defendant.** | Case No.: **8:22-cv-00744**<br><br>**CLASS ACTION COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF FOR VIOLATIONS OF:**<br><br>1) **UNFAIR COMPETITION LAW ("UCL"), CAL. BUS. & PROF. §§ 17200, *ET SEQ.*;**<br><br>2) **NEGLIGENT MISREPRESENTATION; AND,**<br><br>3) **NEGLIGENCE.**<br><br>**JURY TRIAL DEMANDED** |

**INTRODUCTION**

1. Plaintiffs ALEXANDRA HOEVELKAMP ("Plaintiff Alexandra"), KELLY HOEVELKAMP ("Plaintiff Kelly"), and TIMOTHY HOEVELKAMP ("Plaintiff Tim") (together the "Plaintiffs"), individually and on behalf of all others similarly situated, bring this action to recover damages and prevent the unlawful and misleading business practices of defendant JPMORGAN CHASE BANK, N.A. ("Defendant" or "Chase"), resulting in violations of: (1) California's Unfair Competition Law ("UCL"), Bus. & Prof. Code §§ 17200, *et seq*., and for (2) negligent misrepresentation and (3) negligence.

2. Chase among other things, provides mortgage services throughout the United States, including in the State of California and within this judicial district.

3. Chase earns revenue from mortgage loan servicing in several ways. For instance, Chase earns money from the interest rate it charges when lending out money associated with the home mortgages it provides to borrowers in its function as a home mortgage lender.

4. Chase also provides several residential loan options, online and through its physical locations.

5. As described herein, Chase has been engaging in unfair and misleading business practices by making material misrepresentations of fact and/or acting negligently with consumers seeking a residential mortgage. Specifically, Chase has mislead prospective borrowers into reasonably believing that their mortgage loans would be approved (prompting the borrows to remove the loan contingencies) only to turn around and ultimately deny the loan when it suits Chase's interests, resulting in out-of-pocket losses to consumers, including the Plaintiffs.

6. This unscrupulous and misleading business tactic has left borrowers like Plaintiffs with no choice but to scramble to secure alternative financing, often at inferior interest rates, while up against closing deadlines–resulting in fees, penalties and costs being incurred as a direct result of Chase's belated decision to refuse to

honor the original loan offer.

7. Plaintiffs allege the following based upon personal knowledge as to their own acts, and on information and belief as to all other matters, including, the investigation conducted by and through their attorneys which includes, without limitation, a review of Defendant's public documents, announcements, and wire and press releases published by and regarding Defendant, and information readily obtainable on the internet.

JURISDICTION AND VENUE

8. Jurisdiction if proper under 28 U.S.C. § 1332(d) ("CAFA"), which provides for original jurisdiction of the federal courts of any class action in which any member of the class is a citizen of a state different from the defendant, and in which the matter in controversy exceed, in the aggregate, the sum of $5,000,000, exclusive of interest and costs.

9. Upon information and belief, a substantial number of the members of the proposed Classes are residents of a different state from Chase, which is headquartered and has its principal place of business in New York.

10. Upon information and belief, the total claims of individual members in this action are in excess of $5,000,000, where Plaintiffs seek restitution, damages, and other forms of equitable relief, which, when aggregated among the proposed class in the several thousands, exceeds the $5,000,000 threshold.

11. Both diversity jurisdiction and the damages requirement under CAFA are satisfied, and this Court therefore has subject matter jurisdiction.

12. Plaintiffs alleges that at all times relevant herein, Chase conducted business in the State of California, and within this judicial district.

13. This Court has personal jurisdiction over Chase, which transacts business in California and maintains sufficient minimum contacts in California.

14. Venue is proper in the United States District Court for the Central District of California pursuant to 18 U.S.C. § 1391(b)(2) because a substantial part of the

events giving rise to the claims occurred within this judicial district and Chase conducts substantial business within this judicial district.

## PARTIES

15.    At all times relevant, Plaintiffs were and are each an individual residing in the State of California, County of Orange.

16.    Upon information and belief, Chase is a national bank headquartered in New York City, New York, with its corporate offices located at 270 Park Ave 31st Floor, New York, NY 10017.

17.    Chase provides various financial services including home mortgages, banking, insurance, investments and other products and services to consumers, businesses and other institutions.

18.    Chase is reported to have approximately $3.29 trillion in assets.[1]

## FACTUAL ALLEGATIONS

19.    During January of 2022, Plaintiffs began the process of jointly purchasing a home to be the primary residence of Plaintiff Alex, who is the daughter of Plaintiffs Tim and Kelly.

20.    Plaintiffs made an offer on property located in Lake Forest, California during the beginning of January of 2022 (the "Lake Forest Property").

21.    The Plaintiffs' offer on the Lake Forest Property was accepted by the sellers on or around January 12, 2022; and the parties immediately began the escrow process as the sellers desired a quick closing.

22.    The purchase price of the Lake Forest Property was $850,000 and had a 25-day closing date of February 7, 2022.

23.    Like many home purchasers, Plaintiffs sought financing for the Lake

---

[1]   *See* BANKING, *The 15 largest banks in the US* https://www.bankrate.com/banking/biggest-banks-in-america/ (Feb. 11, 2022).

Forest Property and desired to take out a home mortgage loan with Chase based on an attractive interest rate.

24. On or about January 12, 2022, a Chase loan officer confirmed with Plaintiffs Kelly and Alex that loan for the Lake Forest Property could be closed within the 25 day-period, and that the loan and appraisal contingencies could be removed within 12 days (i.e., by January 24, 2022).

25. This understanding was confirmed in writing via an email correspondence between a Chase Home Lending Advisor and Plaintiffs Kelly and Alex.

26. Shortly thereafter, Plaintiffs received a pre-approval letter from Chase for the home mortgage loan on the Lake Forest Property dated January 12, 2022, with Plaintiffs Kelly and Tim listed as the borrowers.

27. Knowing that they were up against a quickly approaching closing date, Plaintiffs immediately started the application process and provided supporting documents to Chase for the home mortgage on January 12, 2022.

28. The same day, Plaintiffs' offer on the Lake Forest Property was submitted and accepted by the seller, which was memorialized by a signed purchase agreement.

29. Relying on Chase's representations that the loan and contingencies could be completed within the applicable time-period, Plaintiffs wired earnest money (or a good faith deposit on the Lake Forest Property) in the amount of $25,500 on January 14, 2022.

30. Plaintiffs received confirmation of receipt of the earnest money deposit from the escrow company Blue Water Escrow ("BWE") shortly after making the payment.

31. During the end of January 2022, Plaintiffs provided Chase with supporting documentation for the mortgage loan, including an amended 2020 tax return with proof of IRS receipt, which was sent for underwriting review on January 20, 2022.

32. On January 20, 2022, the Lake Forest Property was appraised, and valued at $750,000. Plaintiffs contested that valuation, and thereafter received a revised appraisal of $780,000. Plaintiff's thereafter sought a further appraisal.

33. On January 21, 2022, Plaintiffs received an email from Chase that the "[l]oan [was] conditionally approved" and noting that "Kelly and Alex have provided the documents to clear remaining conditions. File is back in underwriting que for review. [Chase] is tracking well on [the] contingency period."

34. On January 21, 2022, Plaintiffs provided Chase with the Homeowner's Association ("HOA") documents for the Lake Forest Property.

35. Shortly thereafter, on or about January 25, 2022, Plaintiffs' realtor confirmed via telephone call and text messages with Chase's loan officer that the mortgage loan was not a concern. Subsequently, Plaintiffs' realtor called Plaintiffs Kelly and Alex to confirm that Chase indicated that they could proceed to remove the contingencies on the loan.

36. On January 25, 2022, relying on Chase's unequivocal representations, including that the loan was conditionally approved, Plaintiffs removed the loan contingencies, except for the appraisal contingency as Plaintiffs were waiting on a new appraisal of the property.

37. The following week, Plaintiffs' realtor confirmed via phone call and text message again with Chase's loan officer that the loan was not a concern and would be approved. The Chase loan officer instructed the Plaintiffs to remove all contingencies as a result.

38. On February 4, 2022, relying on Chase's promises to approve the loan, Plaintiffs removed all contingencies on the loan and requested an extension of the closing date to February 1, 2022.

39. A few days later, on February 7, 2022, a new appraisal of the Lake Forest Property was set, and the house was appraised for the full asking price of $850,000.

40. On February 8, 2022, Chase raised for the first time (which was after

instructing Plaintiffs to remove all contingencies) that there was a concern with the HOA certifications. This came as a complete shock to Plaintiffs, as they reasonably believed and detrimentally relied on Chase's representations that the loan was going to be approved.

41. Upon information and belief, mortgage lenders typically investigate HOA certifications several weeks before the residential mortgage closing date and before borrowers are informed it is safe to remove loan contingencies.

42. On February 15, 2022, the Chase loan officer sent Plaintiffs an email stating that "[i]n order to successfully close tomorrow [February 16, 2022] we would need to waive your right to review the 2nd appraisal. Can you please sign the attached?"

43. Eager to close on their property, Plaintiffs completed and submitted the waiver form that same day (and within only a few minutes of receiving that email).

44. The very next day, on February 16, 2022 (which should have been the date of closing), Plaintiffs followed up with the Chase loan officer on the status of the loan closure.

45. The Chase loan officer then informed Plaintiffs that Chase was waiting on the HOA certification documents before they could close.

46. On February 17, 2022, Plaintiffs still had not closed on the Lake Forest Property. Concerned and confused by the delay in Chase's finalization of the loan, Plaintiff Kelly met in-person with the Chase loan officer in order to obtain more information.

47. During this February 17, 2022 meeting, Chase informed Plaintiff Kelly that the loan document release was pending the HOA's response to a questionnaire.

48. Plaintiffs were provided with a copy of the HOA questionnaire which was related to property insurance because the coverage for was recently decreased from $40 million to $2.5 million per occurrence.

49. Surprised by this new piece of information, Plaintiff Kelly pressed the Chase loan officer on why this apparent issue was not raised beforehand, but Chase

simply reassured her that the loan would be approved.

50. Later that day, Plaintiff Kelly received a text message from her realtor forwarding an email from Chase's underwriter indicating that home mortgage loan for the Lake Forest Property was denied by Chase.

51. Outraged by Chase's sudden decision to deny the loan, Plaintiff Kelly called Chase on February 18, 2022, and spoke to the loan officer and the Executive Director/Regional Loan officer, pleading for help. However, Plaintiffs were informed that the HOA insurance was an issue for Chase in approving the loan.

52. Plaintiffs were upset and frustrated because the loan closing date was in two weeks and the Plaintiffs needed a definite answer to make an informed decision on how to proceed with the financing of the Lake Forest Property. However, Chase would not confirm or clearly state whether the loan was officially denied.

53. Not wanting to incur other fees and penalties associated with the closing, on or about February 18, 2022, Plaintiffs started a mortgage loan application with Wells Fargo for the property.

54. However, Wells Fargo informed Plaintiffs that Chase needed to issue an official loan cancellation notice in order for Wells Fargo to close the new loan for the Lake Forest Property.

55. On February 18, 2022, Plaintiffs followed up with the Chase loan team via email to confirm whether the loan was in fact denied.

56. Plaintiffs sent a subsequent email to Chase on February 22, 2022 noting that in order to close on the loan with Wells Fargo, Plaintiffs needed an official cancellation letter.

57. As of February 22, 2022, Chase had not confirmed that the loan was denied and failed to provide Plaintiffs with an official cancellation letter.

58. On February 23, 2022, Plaintiffs' realtor informed them that the sellers of the Lake Forest Property agreed to extend the existing closing date until March 9, 2022, but Plaintiffs would be subject to a penalty due to the delay.

59.     Left with no choice, Plaintiffs agreed to an addendum to the purchase agreement where Plaintiffs would incur a daily per diem penalty of $200 from February 17, 2022 until the date of closing.

60.     As a result of the delays, the seller's realtor had to forgo his commission of $32,500 to obtain an extension from his clients, since the sellers wanted a fast closing and were frustrated by the delays.

61.     On February 24, 2022, Chase finally sent Plaintiffs a formal loan declination letter.

62.     Plaintiffs were eventually able to secure a residential loan with Wells Fargo (but with a higher interest rate of 3.375% compared to the 3.000% offered by Chase) and closed on the Lake Forest Property.

63.     Upon information and belief, Chase intentionally and/or negligently failed to properly investigate the loan and mislead Plaintiffs into believing the loan would be approved.

64.     Chase's misleading statements and/or negligent conduct regarding the loan approval caused significant delay, and unreasonable delay in officially denying the loan, forced Plaintiffs to be unable to meet the contractual timeline on the closing of the property, and jeopardized Plaintiffs' earnest money, which could have been lost as a result of Chase's instruction to remove the contingencies on the loan despite not having adequately investigated the property, causing actual damages to Plaintiffs.

65.     Indeed, Chase itself has acknowledge that "[w]aiving your contingencies" can lead to lost earnest money.[2]

---

[2]     Chase, *Understanding earnest money*, https://www.chase.com/personal/mortgage/education/financing-a-home/understanding-earnest-money#:~:text=Earnest%20money%2C%20or%20good%20faith,agreement%20or%20the%20sales%20contract.%5C (last visited March 23, 2022) ("Financing and inspection contingencies protect your earnest money if your mortgage doesn't go

66. As a result of Chase's unfair and misleading business practices and/or negligent actions, Plaintiffs suffered harm and monetary damages.

67. Plaintiffs' monetary damages included, but are not necessarily limited to: (1) $639.15 in additional appraisal fees for the loan with Wells Fargo; (2) approximately $300 for an additional HOA certification because Chase would not disclose the HOA certification to Wells Fargo; (3) $200 a day in penalties to extend the closing date for 18 days, totaling $3,800; (4) and additional time and significant emotional stress in securing an urgent mortgage loan with a different lender, which delayed the closing on the property; and (5) ending up needing to agree to a less favorable interest rate on the residential mortgage loan with Wells Fargo.

68. Had Plaintiff been aware that Chase would refuse to approve the loan after Chase had informed Plaintiffs they could remove loan contingencies, they would have made arrangements to find other funding sooner (including not removing the loan contingencies) and could have avoided penalties and other economic damages that flowed from or related to Chase's delay in officially denying the loan.

## CLASS ACTION ALLEGATIONS

69. Plaintiffs brings this action on behalf of Plaintiffs and all others similarly situated (the "National Class" and "California Sub-Class").

70. Plaintiffs represent, and are members of, the National Class, pursuant to Fed. R. Civ. P. 23(b)(2) and/or (b)(3), which is defined as follows:

> All persons in the United States who paid fees and/or penalties, incurred a higher loan interest rate, and/or incurred out-of-pocket expense relating to Defendant's decision to not approve their residential mortgage loan after Defendant, its employees and/or agents informed the buyer/s that they were approved or conditionally approved for the loans and the buyer/s could remove contingencies on the loan, within

through or the house is beyond repair. However, if you waive either contingency, you forfeit your good faith deposit if the house does not go to sale.").

the four years prior to the filing of the Complaint in this action.

71.     Plaintiffs represent, and are also members of, the California Sub-Class, pursuant to Fed. R. Civ. P. 23(b)(2) and/or (b)(3), which is defined as follows

> All persons in California who paid fees and/or penalties, incurred a higher loan interest rate, and/or incurred out-of-pocket expense relating to Defendant's decision to not approve their residential mortgage loan after Defendant, its employees and/or agents informed the buyer/s that they were approved or conditionally approved for the loans and the buyer/s could remove contingencies on the loan, within the four years prior to the filing of the Complaint in this action.

72.     The National Class and the California Sub-Class are jointly referred to herein as the "Classes." Excluded from the Classes are: (1) Defendant, any entity or division in which Defendant has a controlling interest, and its legal representatives, officers, directors, assigns, and successors; (2) the Judge to whom this case is assigned and the Judge's staff; and (3) those persons who have suffered personal injuries as a result of the facts alleged herein.

73.     Plaintiffs reserve the right to redefine the Classes, including but not limited to expanding the class definition and adding one or more sub-Classes as appropriate based on discovery and specific theories of liability.

74.     The Classes that Plaintiffs seek to represent contains numerous members and is clearly ascertainable including, without limitation, by using Defendant's records to determine the size of the Classes and to determine the identities of individual members of the Classes.

**<u>Numerosity</u>**

75.     The members of the Classes are so numerous that joinder of all members would be unfeasible and impractical. The membership of the Classes is currently

unknown to Plaintiffs at this time. However, on information and belief, the Classes are likely to consist of several thousands of members. Members of the Classes can easily be identified through Defendant's records. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.

**Commonality**

76. There are questions of law and fact common to the Classes that predominate over any questions affecting only individual members of the Classes. Those common questions of law and fact include, without limitation, the following:

   a) Whether Defendant's conduct constituted an unfair business practice;

   b) Whether Defendant's conduct of advising to Plaintiffs and the Classes that they could remove the contingencies on the loan only to turn around and deny the loan was negligent;

   c) Whether Defendant's conduct was misleading;

   d) Whether Defendant made misrepresentations of fact to Plaintiffs and members of the Classes regarding the status of their loans;

   e) Whether Plaintiffs and members of the Classes were damaged economically by Defendant's conduct; and

   f) Whether Defendant should be enjoined from the improper conduct, including but not limited to modifying its policies and procedures relating to the residential loan approval process and denial letters.

**Typicality**

77. Plaintiffs are qualified to, and will, fairly and adequately protect the interests of each member of the Classes with whom they are similarly situated, and Plaintiffs' claims (or defenses, if any) are typical of all members of the Classes as demonstrated herein.

78. Plaintiffs represent and are members of the Classes because Defendant, in misleading Plaintiffs to believe the loan would be approved, instructed them to remove the loan contingencies, and then ultimately denied approval of the loan, which

resulted in Plaintiffs incurring actual monetary loss.

79. Consequently, the claims of Plaintiffs are typical of the claims of members of the Classes and Plaintiffs' interests are consistent with and not antagonistic to those of the other members of the Classes whom the Plaintiffs seek to represent.

80. Plaintiffs and all members of the Classes have been impacted by, and face continuing harm arising out of, Defendant's statutory violations and misconduct as alleged herein.

**Adequacy**

81. Plaintiffs are qualified to, and will, fairly and adequately protect the interests of each Class member with whom Plaintiffs are similarly situated, as demonstrated herein.

82. Plaintiffs acknowledge that Plaintiffs have an obligation to make known to the Court any relationship, conflicts, or differences with any member of the Classes.

83. Plaintiffs' attorneys, the proposed class counsel, are versed in the rules governing class action discovery, certification, and settlement. In addition, the proposed class counsel is experienced in handling claims involving consumer actions and violations of the causes of action asserted. Plaintiffs have or will expend time and money necessary for the prosecution of this action for the substantial benefit of each member of the Classes.

84. Neither Plaintiffs nor Plaintiffs' counsel have any interests adverse to those of the other members of the Classes.

**Predominance**

85. Questions of law or fact common to the members of the Classes predominate over any questions affecting only individual members of the Classes. The elements of the legal claims brought by Plaintiffs and members of the Classes are capable of proof at trial through evidence that is common to the Classes rather than

individual to its members.

**Superiority**

86. A class action is superior to other available methods for the fair and efficient adjudication of this controversy because individual litigation of the claims of all members of the Classes is impracticable and questions of law and fact common to the Classes predominate over any questions affecting only individual members of the Classes. Even if every individual member of the Classes could afford individual litigation, the court system could not. It would be unduly burdensome to the courts if individual litigation of the numerous cases were to be required.

87. Individualized litigation also would present the potential for varying, inconsistent, or contradictory judgments, and would magnify the delay and expense to all parties and to the court system resulting from multiple trials of the same factual issues. By contrast, conducting this action as a class action will present fewer management difficulties, conserve the resources of the parties and the court system, and protect the rights of each member of the Classes. Further, it will prevent the very real harm that would be suffered by numerous members of the Classes who will be unable to enforce individual claims of this size on their own, and by Defendant's competitors, who will be placed at a competitive disadvantage because they chose to obey the law. Plaintiffs anticipate no difficulty in the management of this case as a class action.

88. The prosecution of separate actions by individual members of the Classes may create a risk of adjudications with respect to them that would, as a practical matter, be dispositive of the interests of other members of the Classes not party to those adjudications, or that would otherwise substantially impair or impede the ability of those non-party members of the Classes to protect their interests.

89. The prosecution of individual actions by members of the Classes would establish inconsistent standards of conduct for Defendant.

90. Defendant has acted or refused to act in ways generally applicable to the Classes, thereby making appropriate final and injunctive relief or corresponding declaratory relief with regard to members of the Classes as a whole. Likewise, Defendant's conduct as described above is unlawful, is capable of repetition, and will continue unless restrained and enjoined by the Court.

91. The Classes may also be certified because:

(a) the prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudication with respect to individual members, which would establish incompatible standards of conduct for Defendant;

(b) the prosecution of separate actions by individual members would create a risk of adjudications with respect to them that would, as a practical matter, be dispositive of the interests of other members not parties to the adjudications, or substantially impair or impede their ability to protect their interests; and,

(c) Defendant has acted or refused to act on grounds generally applicable to the Classes, thereby making appropriate final and injunctive relief with respect to the members of the Classes as a whole.

92. At this time, this suit expressly is not intended to request any recovery for personal injury and claims related thereto.

**FIRST CAUSE OF ACTION**

**VIOLATION OF CAL. BUS. & PROF. CODE §§ 17200, *ET SEQ.***

**CALIFORNIA'S UNFAIR COMPETITION LAW ("UCL")**

**[CALIFORNIA SUB-CLASS ONLY]**

93. Plaintiffs incorporate by reference all of the above paragraphs of this Complaint as though fully stated herein.

94. Plaintiffs and Defendant are each "person[s]" as defined by California Business & Professional Code § 17201.

95. California Business & Professional Code § 17204 authorizes a private right of action on both an individual and representative basis.

96. "Unfair competition" is defined by Business and Professions Code Section § 17200 as encompassing several types of business "wrongs": (1) an "unlawful" business act or practice, (2) an "unfair" business act or practice, (3) a "fraudulent" business act or practice, and (4) "unfair, deceptive, untrue or misleading advertising." The definitions in § 17200 are drafted in the disjunctive, meaning that each of these "wrongs" operates independently from the others.

97. By and through Defendant's conduct alleged in further detail above and herein, Defendant engaged in conduct that constitutes unfair business practices prohibited by Bus. & Prof. Code § 17200 *et seq*.

98. Defendant's actions, representations or omissions constitute an "unfair" business act or practice under Business & Professions Code §17200, *et seq*. in that Defendant's conduct is substantially injurious to consumers, offends public policy, and is immoral, unethical, oppressive, and unscrupulous as the gravity of the conduct outweighs any alleged benefits attributable to such conduct.

99. Without limitation, it is an unfair business act or practice for Defendant to offer borrowers (including Plaintiffs) a residential mortgage loan, instruct them to remove the contingencies and then ultimately refusing to approve the loan.

100. It is also an unfair business act or practice for Defendant to fail to promptly provide an official letter of its decision to deny the residential mortgage loan, leaving consumers in a stage of unreasonable uncertainty concerning the loan.

101. Such conduct by Defendant offends established public policy and/or is immoral, unethical, oppressive, unscrupulous and/or substantially injurious to consumers in that consumers are led to believe that their loans were approved only to be left in precarious financial position by having to scramble secure alternative financing, incur fees and penalties, and also risk losing their earnest money.

102. Plaintiffs and members of the California Sub-Class could not have

reasonably avoided the injury they suffered.

103. Plaintiffs diligently, and timely, provided Chase with the requisite information to process the loan and Chase mislead Plaintiffs into believing the loan would be approved and that the contingencies could thus be removed.

104. Plaintiffs reserve the right to allege further conduct that constitutes other unfair business acts or practices.

105. Such conduct is ongoing and continues to this date, as Defendant continues to refuse to provide Plaintiffs, and those similarly situated, with compensation for penalties, costs and other economic harms that resulted from Chase's unfair conduct, including its belated denial of their loans.

### SECOND CAUSE OF ACTION

### NEGLIGENT MISREPRESENTATION

### [NATIONAL CLASS AND CALIFORNIA SUB-CLASS]

106. Plaintiffs incorporate by reference all of the above paragraphs of this Complaint as though fully stated herein.

107. As set forth herein, Defendant misrepresented that Plaintiffs' residential mortgage loan would be approved and therefore instructed Plaintiffs that the loan contingencies could be removed, when in fact Chase was not going to approve Plaintiffs' loan and ultimately declined to approve the loan through a belated denial letter. This misrepresentation of fact required Plaintiffs to secure urgent financing with another lender at a higher interest rate and to incur penalties and other costs. As such, Defendant's misrepresentation of the status of the residential mortgage loans sought by the Plaintiffs and members of the Classes caused economic injuries.

108. At the time Defendant made these misrepresentations, Defendant knew or should have known that these misrepresentations were false. Defendant at least negligently misrepresented and or negligently omitted material facts about the approval of Plaintiffs' loan, especially where Defendant had not fully investigated the HOA insurance, which ultimately led to its denial of the Plaintiffs' loan.

109.  In providing lending services to Plaintiffs and the members of the Classes, Defendant owed a duty to exercise reasonable care to make full, fair, and adequate disclosure in connection with the status of their loans, and whether or not they had in fact been approved. This duty included, among other things, not misrepresenting facts regarding the status of their loan applications.

110.  It was foreseeable that if Defendant did not take reasonable measures to ascertain and ensure the accuracy and truthfulness of its representations, Plaintiff and the members of the Classes would rely on its representations and remove the contingencies on their loans, only to be left with no financing from Chase. Defendant should have known to take precautions to ensure its representations regarding the loan approval were accurate.

111.  Further, Chase did not take reasonable steps to promptly investigate the HOA certifications, or similar certification, and prior to informing the Plaintiffs and the members of the Class that contingencies on the loan could be removed.

112.  The negligent misrepresentations and omissions made by Defendant, upon which Plaintiff and members of the Classes reasonably, justifiably, and detrimentally relied, were intended to induce and influence, and actually induced and influenced, Plaintiff and members of the Classes to seek out Defendant's residential loan services.

113.  Plaintiff and the Classes would not have removed the contingencies on their loans true facts had been known. The negligent actions and misrepresentations of Defendant caused actual and tangible concrete injury and harm to Plaintiffs and the members of the Classes who are entitled to damages and other legal and equitable relief as a result.

114.  Defendant's negligence was a substantial factor in causing harm to Plaintiffs and members of the Classes. As a direct and proximate cause and result of Defendant's failure to exercise reasonable care and use reasonable measures to ensure the accuracy of its representations, Plaintiffs and the Classes have suffered actual

injury-in-fact and economic damages, including incurring penalties, appraisal fees, adverse loan terms, and other economic harms.

115. Neither Plaintiffs nor other members of the Classes contributed to the unlawful conduct set forth herein, nor did they contribute to Defendant's making of its misrepresentation, nor to the insufficient policies, procedures, and measures which were omitted and led to the failure to ensure the accuracy and truthfulness of Defendant's claims in connection with the status of their loans.

116. Plaintiffs and the members of the Classes request the Court enter an order awarding Plaintiffs and the members of the Classes mandatory restitution, rescission, and/or damages, and that they are entitled to recover their reasonable attorneys' fees.

117. Plaintiffs and the members of the Classes therefore also seek pre-and-post-judgment interest and attorneys' fees and costs as allowed by statute, including without limitation those recoverable under Cal. Code Civ. Proc. § 1021.5, any common law "private attorney general" equitable doctrine, any "common fund" doctrine, any "substantial benefit" doctrine, and/or any equitable principles of contribution and/or other methods of awarding attorneys' fees and costs.

**THIRD CAUSE OF ACTION**

**NEGLIGENCE**

**[NATIONAL CLASS AND CALIFORNIA SUB-CLASS]**

118. Plaintiffs incorporate by reference all of the above paragraphs of this Complaint as though fully stated herein.

119. The elements of a cause of action for negligence are: "(a) a legal duty to use due care; (b) a breach of such legal duty; [and] (c) the breach as the proximate or legal cause of the resulting injury." *Ladd v. County of San Mateo*, 12 Cal. 4th 913, 917 (1996).

120. The first element of duty "may be imposed by law, be assumed by the defendant, or exist by virtue of a special relationship." *Doe v. United States Youth Soccer Assn., Inc.* 8 Cal. App. 5th 1118, 1128 (2017).

121.   Defendant owed Plaintiffs and members of the Classes a duty of care; and in upholding that duty, Defendant was obligated to make true and accurate representations regarding the status of their residential mortgage loan.

122.   Defendant was required to exercise due care in providing Plaintiffs and members of the Classes with mortgage services, including accurately representing the status of their loan applications.

123.   Defendant breached its duty to Plaintiffs and members of the Classes by making false and/or negligent misrepresentations regarding the status of their loan approval.

124.   As a direct and proximate result of Defendant's breach of its duty, Plaintiffs and members of the Classes has suffered and will suffer injury, including but not limited to loss of the benefit of a timely closing, and loss of the benefit of Defendant's mortgage service offerings.

125.   Plaintiffs and members of the Classes have also paid fees, penalties, and/or incurred a higher loan interest rate due to Defendant's failure to approval their residential mortgage loan after informing the buyer that they could remove contingencies on the loan.

126.   As a direct and proximate result of Defendant's breach of its duty, Plaintiffs and members of the Classes have suffered and will continue to suffer other forms of injury and/or harm, and other economic and non-economic losses.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and members of the Classes, pray for the following relief against Defendant:

- That this action be certified as a Class Action, establishing the National Class and California Sub-Class;

- Appointing Plaintiffs as the representative of the Classes;

- Appointing the law firms representing Plaintiffs as Class Counsel;

- That the Court find and declare that Defendant has violated the UCL and committed unfair business practices;

- An order requiring Defendant to pay restitution to Plaintiffs and the California Sub-Class due to Defendant's UCL violations, pursuant to Cal. Bus. & Prof. Code §§ 17200-17205 in the amount of economic harm suffered as a result of their loans being denied;

- An order requiring imposition of a constructive trust and and/or disgorgement of Defendant's ill-gotten gains and to pay restitution to Plaintiffs and all members of the California Sub-Class and to restore to Plaintiffs and members of the California Sub-Class all funds acquired by means of any act or practice declared by this court to be an unlawful, fraudulent, or unfair business act or practice, in violation of laws, statutes or regulations, or constituting unfair competition;

- An Order enjoining Defendant from continuing the wrongful conduct alleged herein and be required to comply with all applicable laws, including public injunctive relief;

- An Order awarding Plaintiffs and the members of the Classes mandatory restitution and/or damages;

- Actual damages, compensatory and all other damages allowed under applicable laws;

- Costs of suit;

- Pre-Judgment and Post-Judgment interest;

- An award of reasonable attorneys' fees for Plaintiffs and the Classes pursuant to Code of Civil Procedure § 1021.5, the private attorney general doctrine, the common fund doctrine and/or any other applicable law; and,

- Any and all other relief as this Court may deem necessary or appropriate.

## JURY DEMAND

127.   Pursuant to the Seventh Amendment to the Constitution of the United States of America, Plaintiffs are entitled to, and demand, a trial by jury on all issue so triable.

Dated: April 1, 2022                    Respectfully submitted,

**KAZEROUNI LAW GROUP, APC**

By:*/s/ Abbas Kazerounian, Esq.*
    ABBAS KAZEROUNIAN, ESQ.
    ak@kazlg.com
    ATTORNEY FOR PLAINTIFFS